**[Cite as *In re R.S.*, 2016-Ohio-1492.]**

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

IN RE: R.S.

C.A. No.     15AP0057

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.     14-0074-AND

DECISION AND JOURNAL ENTRY

Dated: April 11, 2016

SCHAFER, Judge.

{¶1} Appellant, Rebecca M. ("Mother"), appeals from a judgment of the Wayne County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor child, R.S., and placed her in the permanent custody of Wayne County Children Services Board ("CSB"). This Court affirms.

I.

{¶2} Appellant is the mother of R.S., born November 2, 2002. William B. was determined to be R.S.'s biological father by genetic testing conducted early in the trial court proceedings. Mother later claimed that she had been raped by William B., who was a friend of her own father. William B. is serving a life sentence for aggravated murder and voluntarily surrendered his parental rights to R.S. at the start of the permanent custody hearing. He is not a party to the present appeal.

{¶3} When this case began, Mother and Benjamin M. were married. R.S., Benjamin M.'s six-year-old daughter, and John S., the maternal grandfather ("Grandfather"), lived with them. CSB's early investigation revealed concerns that R.S. inappropriately touched the six-year-old child. A companion case was filed regarding the young child. At some point, Benjamin M.'s daughter went to live with a relative, and Mother and Benjamin M. were divorced.

{¶4} Prior to Mother's marriage to Benjamin M., Mother had been in a nearly ten-year relationship with Jason B. Jason B. was previously considered to be the father of R.S. He remains factually significant to this case because in 2009, R.S. reported to social workers that Jason B. had sexually abused her[1] and because Mother continued a relationship with him and to accept financial support from him.

{¶5} The present case began on January 14, 2014, when CSB filed a complaint in juvenile court, alleging that R.S. was a dependent child. The complaint set forth several concerns: sexual abuse of and by R.S.; Mother's mental health; a family history with children services involving educational neglect, inappropriate supervision, and inappropriate discipline; and the cleanliness and safety of the home. The agency sought protective supervision and, alternatively, temporary custody of R.S. The court permitted the child to remain in Mother's home under the protective supervision of CSB.

{¶6} In March 2014, R.S. was adjudicated dependent, and the same custodial arrangement was continued. At disposition, in April 2014, the trial court was apparently told that Mother had been sexually abused by Grandfather. Accordingly, the court issued an order barring all contact between R.S. and Grandfather until further notice. The trial court did not find good

---

[1] Mother said that she was not aware of Jason B.'s abuse of R.S. until R.S. told a social worker about it following an incident of domestic violence between Mother and Jason B.

cause for removal of R.S. from Mother's home, but stressed to Mother that any violation of the Court's orders could be grounds for removal of the child. Thus, R.S. remained in the custody of Mother and under the protective supervision of CSB.

{¶7} The trial court adopted CSB's proposed case plan and also imposed additional orders. The court required Mother to: (1) consistently attend individual counseling; (2) ensure that R.S. consistently attended individual counseling to address trauma from sexual abuse; (3) maintain a clean and safe home, ensuring appropriate supervision and interaction with the children; (4) complete a substance abuse assessment, follow all recommendations, and submit to random drug screens when requested by CSB; and (5) enroll in parenting classes. The entire family was to complete a family/psychological assessment and follow any recommendations, particularly in regard to the safety of the children. Housing was later added to Mother's case plan because she lost her housing in the process of divorcing Benjamin M. Finally, the trial court specifically instructed Mother to not tell R.S. what to discuss during her counseling sessions.

{¶8} Concerns soon developed that Mother was permitting R.S. to be around Grandfather despite the no contact order. A CSB caseworker went to the home on August 12, 2014, to investigate these concerns. Mother admitted that Grandfather was living in the house and that she permitted unsupervised contact between him and R.S. Mother also admitted her knowledge of the no contact order. Accordingly, the social worker called the police. Mother and Benjamin M. began screaming at each other, and he threatened to leave. Benjamin M. was upset because he believed Mother had hit his child and also because Mother allowed R.S. to be around Grandfather. The police calmed the couple down and waited while he packed a bag and left. Because the police believed it was not safe for R.S. to remain in the home, they took R.S.

into custody pursuant to Juv.R. 6 and CSB arranged for a placement. Mother apparently told R.S. to lie about the fact that Grandfather was staying in the home. R.S. later reported that sometimes Grandfather shared a bed with her while he was living in the home. The following day, the trial court granted emergency temporary custody of R.S. to CSB. Mother was charged with child endangerment and was eventually sentenced to 60 days in jail and 24 months of probation.

{¶9} The trial court granted CSB's motion for a six-month extension of temporary custody and also granted Mother's motion to appoint independent legal counsel for R.S. In time, CSB moved for permanent custody and, alternatively, a second six-month extension of temporary custody. Following a hearing, the trial court denied the motion for extension, granted CSB's motion for permanent custody, and terminated Mother's parental rights. Mother has appealed and assigned one error for review.

II.

**Assignment of Error**

THE COURT ERRED IN GRANTING PERMANENT CUSTODY TO WAYNE COUNTY CHILDREN SERVICES AND SHOULD HAVE GRANTED A SECOND SIX MONTH EXTENSION, AS A GRANT OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶10} Mother asserts that the trial court's judgment granting permanent custody is against the weight of the evidence and that the trial court should have granted a six-month extension instead. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, the child or another child of the same parent has been adjudicated abused, neglected, or dependent

three times, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶11} In determining whether the judgment below is manifestly against the weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶12} The trial court found that the first prong of the permanent custody test was satisfied because R.S. could not be placed with either parent within a reasonable time or should not be placed with either parent. *See* R.C 2151.414(B)(1)(a). In support of that finding, the trial court determined that the child's father was incarcerated for life and had surrendered his parental rights to R.S. *See* R.C. 2151.414(E)(12). The trial court also determined that, notwithstanding reasonable case planning and diligent efforts by the agency, Mother failed to substantially remedy the conditions causing the child to be placed outside the home. *See* R.C. 2151.414(E)(1). In particular, the trial court found that Mother cannot provide a safe and stable living situation where R.S. will not be at risk of sexual abuse. Mother challenges this finding as being against the weight of the evidence.

**Substantially remedy the conditions causing the child to be placed outside the home**

{¶13} The trial court had substantial evidence before it to support the conclusion that, following placement outside the home, Mother "failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." *Id.*

{¶14} R.S. was removed from her home on August 12, 2014 by police pursuant to Juv.R. 6. The child was removed when Mother permitted Grandfather to reside in her home with R.S. and to have unsupervised contact with R.S. in violation of a court order. Since the removal, Mother has not remedied the conditions causing R.S. to be placed outside the home. At the time of removal, Mother and R.S. resided with Benjamin M., his daughter, and Grandfather. Grandfather was paying many of their bills. When Mother and Benjamin M. divorced, Mother lost that housing and, since then, she has resided with either Jason B. or again with Grandfather in her sister Jessica's home.

{¶15} While Jessica testified that she herself pays the rent for her home, Mother testified that Grandfather pays the rent. Both agreed that Grandfather paid the bills for cable, electricity, six cell phones, and "makes sure that everybody has what they need." Grandfather also provides Mother with an insured vehicle for her transportation. Gwen Geitgey, the first caseworker assigned to the case, testified that Mother reported being appreciative of Grandfather and the way he pays for her things, but Mother also stated that he has been controlling, hurtful, and abusive to both her and R.S.

{¶16} Mother continued to maintain a relationship with Jason B. as well and stayed at his home periodically. Mother claims that she despises Jason B. for what he did to her daughter, yet she continues to see him and stay at his home because he provides her with money and occasional transportation. Mother denies that their relationship is sexual, and states that "now it

is more just a friendship." She specifically admitted that she stays with Jason B. because she needs the money as a supplement to what Grandfather gives her.

{¶17} Thus, since the time of R.S.'s removal, Mother has continued to have regular contact with Grandfather and Jason B. She has relied on these two men, whom she has alleged to have sexually abused either her or her daughter to secure housing, food, transportation, and basic necessities. Then, at the permanent custody hearing, Mother reversed herself on 18 years of accusations about Grandfather's abuse. She testified that she had made up the stories because she was mad at Grandfather and was rebelling against him. She denied that she changed her story out of concern that he might otherwise stop his financial support. Mother claims there is no longer a concern in allowing R.S. to have contact with Grandfather, and she would like R.S. to be able to reside with her and Grandfather at Jessica's home. She added, however, that "my dad can be very controlling at times." Mother stated that she would abide by the court's order if it determined that she could not permit contact between R.S. and Grandfather. Jessica also sees no reason to prohibit contact between R.S. and Grandfather. In addition, Mother has not stated any intention of ending her relationship with Jason B., but nevertheless guaranteed that R.S. would not be around him.

{¶18} The trial court found that Mother was not credible in recanting her past accusations about Grandfather and in promising to protect R.S. in the future. The court found instead that Mother is still not able to provide a safe and stable living situation for R.S. where she will not be at risk of being sexually abused. The trial court's findings are supported by the weight of the evidence.

{¶19} The record demonstrates that Mother had been making accusations about Grandfather's sexual abuse of her for the last 18 years. Three caseworkers and the guardian ad

litem all presented testimony that Mother told them of inappropriate behavior by Grandfather towards R.S., including grooming behavior. Grooming was later described by one of the caseworkers as "[b]ehaviors that someone does to [another] to form a relationship or an attachment or get them comfortable with you" with the intention to eventually have a "sexually inappropriate" relationship. Mother permitted R.S. to have contact with Grandfather in the past despite the existence of a no contact order. Mother and her sister Jessica have long relied on Grandfather for many of their basic living expenses, and Mother continues to rely on Jason B. for financial support as well. Jessica claims she can provide housing without Grandfather's support, but she has not presented a realistic plan. Mother has no independent income. She is not employed and her application for social security disability was recently denied.

{¶20} The testimony of mental health professionals also supports the findings of the trial court. The evaluating psychologist found that Mother and R.S. both have long histories of being victimized and sexually abused. Psychological testing disclosed that Mother has a dependent personality disorder with strong avoidant traits. As explained by the psychologist, such individuals have great difficulty acting autonomously and can often be victimized by others due to a fear of abandonment. They also have difficulty dealing with stress or change and tend to hope situations will just go away rather than actively confronting problems and dealing with them. In addition, tests showed that Mother had major stressors in all areas of her life and was at risk for the physical abuse or neglect of children. The psychologist recommended that Mother's contact with R.S. be closely supervised. She recommended therapy for Mother and advised that she "is going to need to be involved in therapy consistently for several years for change to occur." Mother attended counseling fairly regularly, but had made no progress in addressing her mental health issues. This was said to be because Mother did not fully participate or engage in

her counseling.  The caseworker said Mother believed she did not need counseling and did not want to discuss her personal matters at sessions.

{¶21}  The psychologist also evaluated R.S. and described her as very parentified, which she said was concerning in an 11-year-old.  According to the psychologist, R.S. acts more grown up than she really is and appears to know much adult information.  She testified that R.S. misses Mother and wishes she was back with her, but R.S. also wishes Mother would get better and not have as many physical or emotional difficulties.  The psychologist said R.S. was experiencing many symptoms of trauma, anxiety, and depression, but believed R.S. could overcome her difficulties through counseling.

{¶22}  R.S.'s counselor also testified.  She explained that R.S. did not begin to make good progress until she was placed in foster care and her attendance at weekly counseling sessions became more consistent.  R.S. also began to engage more openly after the trial judge admonished Mother not to tell her daughter what to say to the counselor.  While R.S. was comfortable remaining in foster care, being adopted, or returning home, she was excited about the possibility of going home.  The counselor testified that R.S. was excited about going home "so that she can make sure mom is safe and cared for, takes her medications regularly and that she can kind of monitor who's in mom's life."  R.S. said she would make sure Mother took her medications on time and if she asked for more medication, R.S. would tell her "no."  R.S. also expressed concern about Mother's safety.  She expressed fear or anxiety about some of the people Mother placed in her own life, although she believes she would be able to control those situations and who comes into the house.  R.S. reported that Jason B. had threatened both her and Mother.  She believes she can keep herself safe.  The counselor testified that it is not age-appropriate for R.S. to be concerned about caring for a parent to this extent.  She explained that

she has worked on this in counseling sessions with R.S., and R.S. now knows that this does not have to be her role. The therapist believes R.S. is capable of bonding with a new family who intend to adopt her and also believes that adoption would not impede her progress in therapy.

{¶23} A final concern in regard to Mother's ability to safely parent is Mother's judgment. Mother testified that she sometimes drives a car when she knows she should not, either because of recently taking her narcotic pain medication, fatigue, stress, or migraines. She explained that when she has "Court stuff" to do and no one to drive her, "I have to take the risk of doing it[.]" She acknowledged that this puts herself as well as other drivers on the road at risk.

{¶24} Therefore, the evidence fully supports the trial court finding that Mother has not remedied the conditions that caused the removal of the child from the home. By the time of the permanent custody hearing, Mother still had not demonstrated that she could provide a safe, stable living situation for herself and her daughter. She has continued to rely on Grandfather and Jason B., two men she accused of being sexually abusive of her and her daughter, for the financial support of her basic needs. Mother has not removed either Grandfather or Jason from her life, nor has she demonstrated that she could support herself and her daughter without their financial assistance. Mother is not in a position to protect R.S. from further abuse. In addition, Mother has not resolved her substance abuse issues and, despite fairly consistent attendance in counseling sessions, she has not made any progress on her mental health concerns. The first prong findings that Mother has not remedied the concerns that caused the removal of R.S. from the home and that R.S. cannot or should not be returned to Mother in a reasonable time are not against the manifest weight of the evidence.

**Best interest of the child**

{¶25} We next consider the evidence regarding the second prong best interest factors as set forth in R.C. 2151.414(D)(1). When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence in his life and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(7) to (11) apply. R.C. 2151.414(D)(1)(a)-(e). "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL 5178, *3 (Jan. 2, 2002); *see also In re Palladino*, 11th Dist. Geauga No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.

{¶26} The first best interest factor requires consideration of the relevant personal interactions and interrelationships of the child. Mother consistently attended visitation with R.S. and usually brought food or snacks to the visits. Mother and R.S. were said to be bonded, to love each other, and to enjoy the time spent together. For example, they enjoyed doing their hair and make-up together. Nevertheless, Mother's two hours of weekly supervised visits were never increased in frequency, duration, nor did they become less restricted after a year of visits. As set forth more fully above, R.S. is very concerned about Mother's well-being and she wants to take care of Mother, protect her, and control who is in her life. Overall, the evidence does not demonstrate that their relationship is a healthy one.

{¶27} At the time of the permanent custody hearing, R.S. had been in a foster home for a year and was said to be doing well there. Once she entered foster care, her attendance at

counseling sessions improved and she made great progress. Her hygiene and behavior also improved. She is no longer on a behavioral Independent Educational Plan at school. She has made friends and is getting good grades. She now tries to make better choices and is not shy about expressing herself. She has developed age appropriate social skills and behaviors.

{¶28} There is little evidence of a continuing and positive relationship between R.S. and extended family members.

**Wishes of the child**

{¶29} The wishes of the child were expressed by the child's attorney at the beginning of the permanent custody hearing. She stated that R.S. "would like to return home to her mother, if she can be the child and mother act as an adult and mother is not living with Jason." Upon being asked by the trial judge to elaborate on what that means, the attorney responded that R.S. feels that she was often forced to be the reasonable person in the home when she was living with Mother. The attorney believes R.S. would like to see Mother succeed on her case plan so she could be reunited with her, but R.S. also realizes that Mother has not made the necessary progress. Nonetheless, she loves Mother and would like to live with her.

{¶30} The guardian ad litem recommended permanent custody as being in the best interest of the child. The guardian ad litem said it was clear to her that Mother could not take care of herself, and she did not see how Mother could take care of a child. Caseworker Rebecca Mollohan, the last case worker to serve on the case, agreed that permanent custody is in the best interest of R.S.

**Custodial history of the child**

{¶31}  R.S. lived with Mother and Jason B. for most of her early years.  When this case began, R.S. resided with Mother and under the protective supervision of CSB for eight months. She then resided in foster care for approximately one year.

**Whether the child is in need of a legally secure permanent placement**

{¶32}  R.S.'s counselor testified that she believes permanency is important for any child including R.S.  R.S.'s foster home is not a potential adoptive home, but the foster mother is willing to provide a home for R.S. until a permanent placement is found.  R.S.'s counselor testified that R.S. is capable of bonding with an adoptive family and adoption would not impede her progress in therapy

{¶33}  CSB investigated possible relative placements, including the maternal grandmother as well as Mother's brother and two sisters, Jennifer and Jessica.  None produced placement options that were in the best interest of R.S.

{¶34}  The maternal grandmother had a history with child welfare and of criminal behavior.  Mother's brother failed to provide needed information to proceed and also had a disqualifying criminal record.  R.S. indicated that she did not want to live with her maternal aunt Jennifer, stating that she had observed violence in that home.  Mother opposed placement with Jennifer for similar reasons.  The guardian ad item did not think R.S. should be put into a situation where she could be potentially traumatized.  Finally, there is evidence that her maternal aunt Jessica lacked stability.  She had moved several times recently, was still married to one man, was living with another, and had been with a third within the last year.  At the time of the permanent custody hearing, Grandfather was living in Jessica's home, along with five others. Grandfather was providing significant financial support to this household.  Jessica said that she

did not believe the accusations Mother made about Grandfather. The guardian ad litem believed that R.S. needs stability regarding who will be in her home and her relationships with them. The guardian ad litem also expressed concern about Jessica's ability to protect R.S. Moreover, none of the relatives filed a motion for legal custody in the trial court. *See* R.C. 2151.353(A)(3).

{¶35} Caseworker Rebecca Molhollan specifically testified that Mother could not remedy these concerns within the time of a six-month extension. There is no evidence in the record that suggests that Mother could do so.

{¶36} Upon consideration, the record does not demonstrate that the trial court clearly lost its way and created a manifest miscarriage of justice when it found that permanent custody is in the best interest of R.S. *See Eastley,* 132 Ohio St.3d 328, 2012-Ohio-2179, at ¶ 20. Father surrendered his parental rights to R.S., and Mother has not demonstrated her ability to provide a safe, secure, and stable environment for her daughter.

{¶37} The weight of the evidence supports the trial court decision to terminate Mother's parental rights to the child and grant permanent custody to CSB. *Id.* Mother's assignment of error is overruled.

### III.

{¶38} Mother's sole assignment of error is overruled. The judgment of the Wayne County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JULIE A. SCHAFER
FOR THE COURT

CARR, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

JEREMY M. SZUCS, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and MELODY L. BRIAND, Assistant Prosecuting Attorney, for Appellee.

MARIE MOORE, Guardian ad Litem.