[Cite as *In re A.M.*, 2018-Ohio-646.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| | : | |
| A.M., | : | |
| | : | Case Nos. 17CA32 |
| Adjudicated Abused and | : | 17CA36 |
| Dependent Child, | : | |
| | : | DECISION AND |
| E.D., | : | JUDGMENT ENTRY |
| | : | |
| Adjudicated Dependent Child. | : | |
| | : | RELEASED 02/15/2018 |

APPEARANCES:

Frank A. Lavelle, Athens, Ohio, for appellant-mother.

Darren L. Meade, Columbus, Ohio, for appellant-father.

Keller J. Blackburn, Athens County Prosecuting Attorney, and Merry M. Saunders, Athens County Assistant Prosecuting Attorney, Athens, Ohio, for appellee.

Hoover, P.J.

{¶1}   K.M., the children's biological mother, appeals the trial court's judgments that awarded Athens County Children Services ("the agency") permanent custody of seven-year-old A.M. and three-year-old E.D. J.C., A.M.'s biological father, appeals the trial court's judgment that awarded the agency permanent custody of A.M. For the reasons that follow, we affirm the trial court's judgments.

**I.  FACTS**

{¶2}   In May 2016, six-and-one-half-year-old A.M. reported to a teacher that her mother's live-in boyfriend, G.D., sexually abused her "100s of times." The agency subsequently

sought and obtained emergency temporary custody of A.M. and her younger brother, E.D.[1] The agency additionally filed separate complaints that alleged A.M. and E.D. are abused, neglected, and dependent children. The agency requested the court to grant it temporary custody of the children.

{¶3}     The trial court later adjudicated A.M. abused and dependent and adjudicated E.D. dependent. The court dismissed the remaining allegations contained in the complaints. The court also placed the children in the agency's temporary custody. The court further found that the agency used reasonable efforts to prevent the children's continued removal from the home but that the mother's decision to continue living with G.D., the perpetrator, made reunification "inadvisable."

{¶4}     The agency developed a case plan for the family. The case plan indicated that the mother would need to change the following behavior in order to reduce risk to the children: (1) "learn new discipline techniques and strategies"; (2) "learn protective parenting capacities to prevent future abuse/neglect of her children"; and (3) "work with a mental health provider to learn about sexual abuse, her own protective capacities and the effects of this type of abuse." The case plan required the mother to work with a parent mentor, engage with Help Me Grow and any other service providers regarding E.D.'s development,[2] regularly visit the children, and undergo counseling in order to understand A.M.'s sexual victimization.

{¶5}     The case plan indicated that A.M.'s father, J.C., needs to develop a father-daughter relationship with A.M., obtain safe and stable independent housing, obtain a source of income to provide for A.M.'s basic needs, and learn new parenting techniques and strategies for a child that has experienced sexual abuse. The case plan required J.C. to regularly visit A.M.,

---

[1] G.D. is E.D.'s father and is not involved in this appeal.
[2] After the children entered the agency's temporary custody, E.D. was diagnosed with a rare genetic condition that causes some learning delays and other developmental issues.

work with a parent mentor, and engage with Integrated Services to obtain housing, counseling, and case management needs.

{¶6}     On April 7, 2017, the agency filed a motion to modify the disposition to permanent custody. The agency asserted that the children cannot be placed with their parents within a reasonable time or should not be placed with their parents. The agency alleged that the mother has not made progress in addressing the sexual abuse that A.M. suffered and has not acknowledged that G.D. sexually abused A.M. The agency further asserted that even though the mother claims that she no longer shares a relationship with G.D., the two recently were spotted together at a grocery store and were observed leaving the store in the same vehicle. The agency argued that the mother's failure to address A.M.'s sexual abuse and to admit that G.D. was the perpetrator illustrates that she cannot adequately protect her children. The agency claimed that returning the children to their mother would not be safe when the mother refuses to believe that her paramour could have perpetrated sexual abuse against A.M.

{¶7}     The agency additionally asserted that A.M. cannot be placed with her father within a reasonable time or should not be placed with him. The agency alleged that her father is not an appropriate placement due to his mental health issues and his lack of appropriate housing for A.M.

{¶8}     At the permanent custody hearing, Nickie Webb, A.M.'s mental health counselor, testified that she sees A.M. approximately once per week. Webb explained that although A.M. has done well in foster care, A.M. is anxious about the children services case and would like to return home to her mother. Webb stated that A.M. enjoys visiting with her father, but A.M. has not mentioned a desire to live with her father. Webb related that A.M. definitely does not want to see G.D. and is "angry with him."

{¶9}     Webb indicated that A.M. has expressed concern that the agency's involvement is "her fault" as a result of reporting G.D.'s sexual abuse.  Webb thus explained that A.M. should be placed in an environment with a caregiver who will reinforce that A.M. is not to blame for her family's children services involvement and who will validate A.M.'s feelings. She additionally related that A.M. might be afraid to report any future instances of abuse if A.M. felt that her mother did not believe her first report, or if she thought that her disclosure might lead to another removal from her home.

{¶10}   The children's foster mother testified that the children have lived in her home for a little over one year. She stated that when A.M. initially entered her care, A.M. lacked appropriate boundaries with strangers. The foster mother related that A.M. has since developed more appropriate boundaries and displays more caution around strangers.

{¶11}   The foster mother explained that when E.D. initially entered her home, he exhibited a speech delay. Further testing revealed that E.D. has a rare chromosomal abnormality that includes speech and cognitive delays. The foster mother testified that E.D.'s speech has improved since entering her care. Both children are doing well in her home and are very pleasant children. The foster mother indicated that A.M. and E.D. appear bonded to one another and interact like typical siblings.

{¶12}   The children's foster father testified that in early March 2017, he observed the mother and G.D. together at a grocery store. He stated that they left the store in the same vehicle.

{¶13}   ACCS parent mentor and family support worker Jennifer Brooks testified that she provides parent mentoring services and also supervises visitations. Brooks explained that she contacted all three parents involved in the case. She related that before she could complete a home visit with J.C., he began sending her inappropriate messages. Brooks stated that J.C. asked

her if she was single and if she wanted to be in a relationship. Brooks immediately notified her supervisor and closed the case.

{¶14} Brooks stated that she started working with the mother and G.D. around the beginning of August 2016. She explained that she closed G.D.'s case in January 2017 because he had completed all tasks listed on the initial referral. Brooks continues to work with the mother. Brooks related that she helped the mother with developmental information, parenting skills, potty training, and protective capacities regarding A.M. She testified that she discussed A.M.'s sexual abuse allegations and how to protect A.M. from further abuse.

{¶15} Brooks indicated that throughout her discussions with the mother, the mother consistently related that she did not believe A.M.'s disclosures. Instead, the mother offered varying explanations for A.M.'s allegations: J.C. concocted the story and told A.M. to blame G.D. when J.C. actually was the perpetrator; G.D.'s brother was the perpetrator; A.M. is malicious and would say things to get attention or to get G.D. in trouble; A.M. walked in on G.D. and the mother having sex and may have gotten ideas from viewing them; A.M. may have seen pornographic movies; and A.M. is extremely jealous of E.D. and may have made up the story to get attention. Brooks explained that the mother's denials have made it impossible to work with the mother on her protective capacities. Brooks further noted that the mother and G.D. did not actually separate until the children had been in the agency's custody for five or six months and that they informed Brooks multiple times that they separated only because the agency expected them to do so.

{¶16} Brooks agreed that the mother generally cooperated with her and appeared eager to learn. Brooks stated that the mother "did very well with parent mentoring. She took every piece of information and she also applied it during visitation." Brooks told the mother that she is

"a really good mom." Brooks testified that the mother even asked if parent mentoring services could continue if the children returned home; and Brooks encouraged the mother to instead state, "when the kids come home." Brooks explained that the mother shared her plan to ask her sister to move into the house so that someone would always be at home to care for the children.

{¶17} Despite the mother's parenting skills, the mother still refused to recognize that G.D. perpetrated sexual abuse upon A.M. This caused Brooks great concern regarding the mother's "capacity to protect" the children. Brooks did not agree with the mother's counsel that the mother has progressed in her understanding from shock, to denial regarding the number of occurrences, to acceptance. Brooks stated she does not believe the mother has "made progress in that aspect." Brooks related that the mother did not simply express disbelief at the number of occurrences, but instead, the mother did not believe that the incidents even occurred.

{¶18} Tara Carsey testified that she worked with the family to develop a case plan to address A.M.'s sexual abuse and E.D.'s delays. Carsey indicated that the agency had concerns that the mother continued to live with G.D. for five or six months after A.M.'s disclosure and the children's removal. Carsey stated that she discussed the parties' living situation with the mother and advised the mother that her chances of having the children returned to her home would be increased if G.D. did not live in the home. Carsey related that G.D. moved out of the mother's home in late October or early November 2016.

{¶19} Carsey explained that although the mother complied with the case plan requirements to obtain mental health counseling and participate in parent mentoring, the mother still did not believe that G.D. sexually abused A.M. Carsey offered to show the mother a recording of A.M.'s forensic interview to which she declined. Carsey indicated that the mother's

denial led her to believe that the mother would not be able to adequately protect the children from future abusive situations.

{¶20} Carsey testified that E.D. had speech delays when he first entered the agency's care and that the mother now understands E.D.'s issues.

{¶21} Carsey stated that A.M.'s father J.C. consistently visited her. However, Carsey also testified that the agency had concerns with J.C.'s mental health and that A.M. should not be placed with him. She related that during a home visit, J.C. exhibited strange behavior. J.C. was not making sense when he spoke. He talked about how he was being watched with the cameras on the poles out front and listened to with the devices that were in the house. J.C. had been admitted to Appalachian Behavioral Health where he spent about three weeks. Although J.C. was receiving medication and case management to work on his social skills, Carsey still had concerns with J.C.'s cognitive ability and ability to protect A.M. Carsey further indicated that J.C.'s living situation was not conducive for a healthy environment for A.M. J.C. lived in a three-bedroom trailer with his mother, stepfather, and two adolescents who are in his mother's legal custody.

{¶22} Carsey related that in October 2016, the agency determined that it would seek permanent custody of the children, but the agency did not actually file its permanent custody motion until April 2017. Carsey explained that in October 2016, the agency decided that it would seek permanent custody because the mother and G.D. had not fully separated and J.C.'s mental health was a serious concern. Carsey stated that after the agency decided that it would seek permanent custody, it continued to provide services to the family, but the agency did stop reunification efforts.

{¶23} Carsey ultimately testified that placing the children in the agency's permanent custody would serve their best interests. She explained that the children need a safe and stable home, with people who can keep them safe from abuse and neglect.

{¶24} The children's guardian ad litem testified that granting the agency permanent custody of the children would serve their best interests. The guardian ad litem agreed that the mother was not capable of providing the children with a safe home because of her unwillingness to believe A.M. about being abused. The guardian ad litem related that the mother would not be able to adequately protect A.M. from future abuse if the mother does not believe A.M.'s story. Likewise, the guardian ad litem did not believe that J.C. could provide A.M. with a safe, stable home due to his mental health issues and lack of independent housing.

{¶25} Michele Papai testified that in late May 2017, the mother was referred to her for counseling. Papai testified that the mother appeared to be motivated. Papai explained that the mother still has "a question in her mind" whether G.D. was the perpetrator and would like to undergo therapy with A.M. to resolve the issues. Papai opined that the mother would be capable of parenting the children and keeping them safe. Papai testified that they discussed how to keep the children safe if they returned home. She stated that they also discussed that G.D. should have no contact with A.M. Papai believed that the mother possessed an understanding of how to keep her daughter and her son safe.

{¶26} The mother testified that she is capable of protecting the children; and that although A.M.'s disclosure initially shocked her, she has accepted that A.M. suffered sexual abuse. She stated:

> It was shocking at first. I'm always home so I'm struggling with the fact of when
>
> [G.D.] could have done it, and how he could have done it with me always being

home. But there is still always the possibility that something did happen and I just finally come [sic] to accept that even with me always being home and always being around him.

{¶27} The mother explained that she was a stay-at-home mother and could not understand when G.D. could have perpetrated the abuse. She stated that when she, A.M., E.D., and G.D. lived together, it was not "even physically possible" for G.D. and A.M. to have been left alone for the number of times that A.M. alleged the abuse occurred. The mother related that G.D. did not have the opportunity to be alone with A.M. She explained that G.D. worked until 3 or 4 o'clock in the morning and that A.M. left for school before G.D. woke up. The mother stated that G.D. left for work at 4:30 pm and A.M. arrived home from school around 4:00 pm. She testified that G.D. worked five nights per week "but he even went on his days off cause they needed more help." The mother indicated that G.D. "was always at work" and that he "did not like being at home."

{¶28} The mother explained that she and G.D. are no longer romantically involved and that she will not have any contact with him, except as necessary to maintain G.D.'s relationship with E.D. The mother stated that she and G.D. met at a grocery store in March 2017 only to ensure that they did not duplicate Easter gifts for E.D. The mother further related that she will "not get with anybody else," but instead will "direct all of [her] attention to just the kids."

{¶29} The mother indicated that she will be able to keep the children safe. She stated that her sister will move into the home and will be able to watch the children during the mother's working hours.

{¶30}   The mother testified that after she learned about E.D.'s rare genetic disorder, she researched his condition in order to learn more about it. She explained that the disorder may cause heart problems later in life and was the cause of his speech delay.

{¶31}   On cross-examination, the mother explained that during her relationship with G.D., G.D. mentioned that he had lost custody of his daughter. G.D. indicated that the child's mother physically abused the child and that the agency would not allow G.D. to obtain custody of his child. The mother was not alarmed that G.D. had lost custody of his own daughter.

{¶32}   The mother stated that she had difficulty believing that A.M. suffered sexual abuse as many times as she claimed and denied that she ever stated that she did not believe A.M. She agreed that she offered alternate explanations for A.M.'s story. The agency's counsel asked the mother about her statement that A.M. and G.D. could not have been alone together, and the mother explained: "I don't see how it could have happened * * *, but I did say that there's always that possibility that something did happen."

{¶33}   J.C. testified that in 2012, he stopped living with K.M. and A.M. He stated that after he stopped living with A.M., he saw her "every once in awhile." J.C. indicated that his visits with A.M. occurred mostly around holidays or her birthday. J.C. explained that he currently lives with his mother, stepfather, eleven-year-old niece, and twelve-year-old nephew. He stated that he gets along well with his niece and nephew and that A.M. also interacts well with them. J.C. believes that he, his mother, and stepfather can provide A.M. with an appropriate home. J.C. related that the household has sufficient income to provide for A.M.'s basic needs.

{¶34}   J.C. testified that in the summer of 2016, he spent three weeks at Appalachian Behavioral Healthcare (ABH). He explained that he had a nervous breakdown and anxiety and stress. J.C. related that he was diagnosed with PTSD and stress syndrome. He indicated that he

was prescribed medication and that he continues to take his medication. J.C. stated that the medications help him and that he does not believe that his mental health constitutes a barrier to parenting A.M. On cross-examination, J.C. stated that he also was diagnosed with schizophrenia and was prescribed medication for it.

{¶35} J.C. explained that after his release from ABH, he started "equine therapy." He testified that approximately two to three months after he started the therapy, he learned that it was the wrong type of counseling for him. J.C. indicated that he then started seeing a mental health counselor and meets with her almost every week. J.C. testified that he has a case manager at Integrated Services and that they work on housing. J.C. related that he has applied for HUD housing and plans to eventually move out of his mother's house.

{¶36} J.C. stated that he did ask Brooks if she would like to go on a date and that he has not yet received any parent mentoring services. He indicated that he did not understand why the agency failed to refer him to a different parent mentor.

{¶37} J.C.'s mother, P.W., testified that she and her husband, along with J.C., could provide a safe and stable permanent home for A.M. She admitted that she had prior children services involvement; but she stated that she worked with the agency and the cases were eventually closed.

{¶38} The mother's sister, S.M., testified that she intends to move in with K.M. if the children return home. She stated that she would be able to help the mother care for the children. S.M. related her belief that the mother is more protective of the children than she had been before their removal and that she is careful about who she allows around the home. S.M. disputed any assertion that the mother and G.D. are still romantically involved. She stated that

although they were spotted together at a grocery store in March 2017, they met only to discuss

E.D.'s Easter gifts and to ensure they did not duplicate gifts.

{¶39} On August 16, 2017, the trial court granted the agency permanent custody of the

two children. The court found, by clear and convincing evidence, that permanent custody is in

the children's best interests and that the children cannot be placed with their parents within a

reasonable time or should not be placed with their parents. The court thus granted the agency

permanent custody of the two children.

{¶40} The parties timely appealed.

## II. ASSIGNMENTS OF ERROR

### A. Mother

{¶41} K.M. raises two assignments of error:

First Assignment of Error:

> The trial court's decision terminating parental rights, [sic] was against the
> manifest weight of the evidence.

Second Assignment of Error:

> Children services' decision to ask for termination of parental rights was
> extremely premature, and failed to satisfy the "reasonable efforts"
> requirements imposed by law.

### B. Father

{¶42} J.C. raises one assignment of error:

> The trial court's ruling to terminate appellant's parental rights, and grant
> Athens County Children Services permanent custody of his daughter, was
> against the manifest weight of the evidence.

## III. LAW AND ANALYSIS

{¶43} The mother's first assignment of error and the father's sole assignment of error assert that the trial court's decision to grant the agency permanent custody of the children is against the manifest weight of the evidence. Both parents argue that the evidence does not clearly and convincingly show that placing the children in the agency's permanent custody is in their best interests. The parents also tangentially contend that the evidence does not clearly and convincingly support the trial court's R.C. 2151.414(E) determination.

{¶44} In her second assignment of error, the mother asserts that the trial court erred by granting the agency permanent custody when the agency had not actually engaged in reasonable efforts aimed at reunifying the family, but instead, quickly determined to seek permanent custody without affording the mother an adequate opportunity to establish that she is willing and able to provide the children with a legally secure permanent home.

{¶45} The same essential legal principles and analysis guide our discussion of all of the assignments of error. Thus, for ease of analysis we have combined our discussion of the assignments of error.

### A. Standard of Review

{¶46} A reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *In re R.M.,* 2013–Ohio–3588, 997 N.E.2d 169, ¶ 53 (4th Dist.).

> Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be

established before them.  Weight is not a question of mathematics, but depends on

its *effect in inducing belief*."

(Emphasis sic.) *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶

12, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's*

*Law Dictionary* 1594 (6th Ed.1990).

{¶47}  When an appellate court reviews whether a trial court's permanent custody

decision is against the manifest weight of the evidence, the court " ' "weighs the evidence and all

reasonable inferences, considers the credibility of witnesses and determines whether in resolving

conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest

miscarriage of justice that the [judgment] must be reversed and a new trial ordered." ' " *Eastley*

at ¶ 20, quoting *Tewarson v. Simon,* 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001),

quoting *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717

(1st Dist.1983). *Accord In re Pittman,* 9th Dist. Summit No. 20894, 2002–Ohio–2208, ¶¶ 23–24.

{¶48}  In a permanent custody case, the ultimate question for a reviewing court is

"whether the juvenile court's findings * * * were supported by clear and convincing evidence."

*In re K.H.,* 119 Ohio St.3d 538, 2008–Ohio–4825, 895 N.E.2d 809, ¶ 43. "Clear and convincing

evidence" is:

> [T]he measure or degree of proof that will produce in the mind of the trier of fact
>
> a firm belief or conviction as to the allegations sought to be established. It is
>
> intermediate, being more than a mere preponderance, but not to the extent of such
>
> certainty as required beyond a reasonable doubt as in criminal cases. It does not
>
> mean clear and unequivocal.

*In re Estate of Haynes,* 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986). In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel,* 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). *Accord In re Holcomb,* 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), citing *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof."). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *R.M.* at ¶ 55.

{¶49} Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears that the fact-finder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin* at 175. A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " *Id.,* quoting *Martin* at 175; *accord State v. Lindsey,* 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

{¶50} Furthermore, when reviewing evidence under the manifest weight of the evidence standard, an appellate court generally must defer to the fact-finder's credibility determinations. As the *Eastley* court explained:

"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *

If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

### B. Permanent Custody Principles

{¶51}   A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Murray,* 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *accord In re D.A.,* 113 Ohio St.3d 88, 2007–Ohio–1105, 862 N.E.2d 829, ¶¶ 8-9. A parent's rights, however, are not absolute. *D.A.* at ¶ 11. Rather, " 'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham,* 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.,* 300 So.2d 54, 58 (Fla.App.1974).  Thus, the State may terminate parental rights when a child's best interest demands such termination. *D.A.* at ¶ 11.

{¶52}   Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing. The primary purpose of the

hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. *Id.* Additionally, when considering whether to grant a children services agency permanent custody, a trial court should consider the underlying purposes of R.C. Chapter 2151.01.

### C. Permanent Custody Framework

{¶53}   A children services agency may obtain permanent custody of a child by (1) requesting it in the abuse, neglect or dependency complaint under R.C. 2151.353, or (2) filing a motion under R.C. 2151.413 after obtaining temporary custody.  In this case, the agency sought permanent custody of the children by filing a motion under R.C. 2151.413.[3] When an agency files a permanent custody motion under R.C. 2151.413, R.C. 2151.414 applies. R.C. 2151.414(A).

{¶54}   R.C. 2151.414(B)(1) specifies that a trial court may grant a children services agency permanent custody of a child if the court finds, by clear and convincing evidence, that (1) the child's best interest would be served by the award of permanent custody, and (2) if the following conditions applies:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-

---

[3] We note that in their appellate briefs, K.M. and J.C. assert that R.C. 2151.353(A)(4) provides the framework for the trial court's permanent custody decision in the case at bar. That statute, however, pertains to complaints seeking permanent custody as the initial disposition and not to motions to modify a prior disposition to permanent custody. *See generally In re Shifflet*, 4th Dist. Athens No. 06CA13, 2006-Ohio-3576, ¶ 21.

two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

* * *

### 1.  R.C. 2151.414(B)(1)(a)

{¶55}  In the case at bar, the trial court found that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent, and thus, that R.C. 2151.414(B)(1)(a) applies. In determining whether a child cannot be placed with either parent within a reasonable time or should not be placed with either parent, R.C. 2151.414(E) requires the trial court to consider "all relevant evidence" and outlines the factors a trial court "shall consider." If a court finds, by clear and convincing evidence, the existence of any one of the listed factors, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent."

{¶56}  Here, the trial court cited R.C. 2151.414(E)(1), (4), (11), (14), (15), and (16) to support its finding. Those provisions indicate that a court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent if any of the following conditions exist:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the

child's home. In determining whether the parents have substantially remedied

those conditions, the court shall consider parental utilization of medical,

psychiatric, psychological, and other social and rehabilitative services and

material resources that were made available to the parents for the purpose of

changing parental conduct to allow them to resume and maintain parental duties.

* * * *

(4) The parent has demonstrated a lack of commitment toward the child by failing

to regularly support, visit, or communicate with the child when able to do so, or

by other actions showing an unwillingness to provide an adequate permanent

home for the child;

* * * *

(11) The parent has had parental rights involuntarily terminated with respect to a

sibling of the child * * * and the parent has failed to provide clear and convincing

evidence to prove that, notwithstanding the prior termination, the parent can

provide a legally secure permanent placement and adequate care for the health,

welfare, and safety of the child.

* * * *

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and

other basic necessities for the child or to prevent the child from suffering physical,

emotional, or sexual abuse or physical, emotional, or mental neglect.

(15) The parent has committed abuse as described in section 2151.031 of the

Revised Code against the child or caused or allowed the child to suffer neglect as

described in section 2151.03 of the Revised Code, and the court determines that

the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes

the child's placement with the child's parent a threat to the child's safety.

(16) Any other factor the court considers relevant.

{¶57}   A trial court may base its decision that a child cannot be placed with either parent

within a reasonable time or should not be placed with either parent upon the existence of any one

of the statutory factors. The existence of a single factor will support a finding that a child cannot

be placed with either parent within a reasonable time or should not be placed with either

parent. *In re C.F.*, 113 Ohio St.3d 73, 2007–Ohio–1104, 862 N.E.2d 816, ¶ 50, citing *In re*

*William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996), syllabus.

### a. R.C. 2151.414(E)(1), (4), and (14)

{¶58}   The trial court determined that R.C. 2151.414(E)(1), (4), and (14) applied to the

mother and showed that the children cannot be placed with her within a reasonable time or

should not be placed with her. The court believed that the mother's consistent failure to

recognize that G.D. sexually abused A.M. demonstrates that she failed to substantially remedy

the conditions that caused the children's removal, that she is unwilling to provide them with an

adequate permanent home, and that she is unwilling to protect them from further abuse.

{¶59}   The mother objects to the trial court's R.C. 2151.414(E)(1) finding. She charges

that the court utterly failed to consider the efforts she undertook in order to remedy the

conditions that led to the children's removal. Moreover, while the mother does not cite any other

particular provision contained within R.C. 2151.414(E), the mother does appear to challenge the

trial court's findings that R.C. 2151.414(E)(4) and (14) show that the children cannot be placed

with her within a reasonable time or should not be placed with her. She asserts that she

consistently visited the children, researched E.D.'s genetic condition, and attended the majority

of the children's medical appointments. The mother additionally contends that the evidence fails to support a finding that she would allow the children to suffer sexual abuse in the future.

{¶60} Several other courts have considered whether a parent's denials of abuse in the home or minimization of an abuser's conduct constitute sufficient evidence to establish that a parent failed to substantially remedy the conditions that caused the children's removal, is unwilling to provide them with an adequate permanent home, or is unwilling to prevent a child from suffering physical, emotional, or sexual abuse. In *In re Z.P.*, 1st Dist. Hamilton Nos. C-160572, C-160584, C-160620, 2017-Ohio-6987, for instance, the court determined that the trial court's decision not to grant the agency permanent custody of the children was against the manifest weight of the evidence. In that case, the agency filed abuse and dependency complaints concerning the mother's five children due to her lack of cooperation in an investigation regarding allegations that her husband had sexually abused his five-year-old stepdaughter. A magistrate later determined to place two of the children in the agency's permanent custody and to place the other three children in a relative's custody. In reaching its decision, the magistrate emphasized the mother's repeated refusal to recognize that her husband—the child's stepfather—had sexually abused her daughter. The mother additionally did not believe her daughter's allegations and claimed that the child's therapist had influenced the child. Moreover, the mother remained married to stepfather, even though she claimed that they had separated. The magistrate determined that the "mother would not be dutiful in protecting [her daughter] from further abuse, and could not genuinely support or participate in [her daughter]'s trauma therapy." *Id.* at ¶ 12. The magistrate concluded that because the mother did not perceive the stepfather as a risk to her children, she would be unlikely to follow court orders preventing the stepfather from having contact with the children. *Id.*

{¶61} The trial court subsequently modified the magistrate's decision. The court determined that awarding the agency permanent custody of the children was not in their best interest and that the relative no longer was a viable placement option. The court thus placed the children in their mother's custody. The guardian ad litem appealed the trial court's judgment.

{¶62} The appellate court agreed with the guardian ad litem. The court emphasized the mother's continued refusal to recognize the stepfather as her daughter's abuser. The court noted that the "mother has consistently insisted that stepfather is not the perpetrator." *Id.* at ¶ 29.The court concluded that the mother's repeated denials illustrated that she is not "capable of, or willing to, protect her children from him," "even with court orders in place." *Id.* The court noted that even though the mother claimed to have distanced herself and lived apart from the stepfather, the evidence showed otherwise. Additionally, the mother and the stepfather had been spotted together on multiple occasions. The mother and stepfather's conduct caused the agency to doubt the sincerity of the mother's willingness to protect her children from the stepfather. The appellate court also recognized the trial court's observation that the "main requirement" the agency expected the mother to fulfill was "to acknowledge that her husband sexually abused [her daughter] and that she would discontinue association with him, forbid him to be near the children and protect them from him." *Id.* at ¶ 28. The court additionally believed that the mother's conduct showed that she was unwilling to provide an adequate permanent home for the children or to prevent them from suffering abuse. The court thus concluded that placing the children with their mother is not in their best interest. The court thus reversed the trial court's judgment and remanded with instructions to enter judgment granting the agency permanent custody of the mother's children.

{¶63} In *In re D.F.*, 7th Dist. Noble No. 16 NO0439, 2017-Ohio-2711, one of the mother's four children disclosed to a teacher that her father inappropriately touched her. The agency later filed an abuse and neglect complaint regarding the four children. The complaint alleged that the father had been sexually abusing the three youngest children and that the mother knew about the abuse and did nothing about it. The father later was convicted of rape and gross sexual imposition and sentenced to prison.

{¶64} The trial court subsequently granted the agency permanent custody of the children. The court found that the mother was unable or unwilling to prevent the children from suffering physical, emotional, or sexual abuse. The court observed that one of the children informed the mother that the father had sexually abused her, but the mother "refused to believe [the child], refused to investigate, and failed to report the matter to authorities." *Id.* at ¶ 12. The trial court additionally found that the mother "still refuses to believe the abuse occurred even though the father has confessed." *Id.* The mother appealed.

{¶65} On appeal, the mother asserted that the evidence did not support the trial court's finding that she is unwilling to prevent the children from suffering physical, emotional, or sexual abuse. The appellate court disagreed and determined that the record contained clear and convincing evidence that the mother's refusal to believe the child, refusal to investigate, failure to report the matter, and continued denial that abuse occurred showed that she is unwilling to prevent the children from suffering physical, emotional, or sexual abuse. The court pointed out that the caseworker testified that when the child reported the abuse to her mother, the mother did not believe her and called her a liar; and the children's therapist stated that the abused child reported an incident when the mother observed the father and the child in bed together but the mother did nothing about it.

{¶66} The court further noted that the mother testified and claimed that she was unaware of the abuse and that the child never reported any abuse to her. The mother was questioned whether she believed that the father sexually abused the child, and she responded, "I don't know what to believe." *Id.* at ¶ 31. Later, she stated, "I can't say it did [happen] and I can't say it didn't. I did not see it." *Id.* The mother then stated "that she still does not know what happened and does not want to know." *Id.* The court found that the mother "did nothing to protect her child from the sexual abuse" and still did not believe that the father sexually abused the child, even though he pleaded guilty to raping the child. *Id.* at ¶ 32. The court thus agreed with the trial court's finding that the mother was unwilling to prevent her child from suffering physical, emotional, or sexual abuse and that the children cannot be placed with their mother within a reasonable time or should not be placed with their mother. *Id.*

{¶67} In *In re R.S.*, 9th Dist. Wayne No. 15AP0057, 2016-Ohio-1492, the trial court awarded the agency permanent custody of the mother's daughter based upon a finding that the mother failed to substantially remedy the conditions that led to the child's removal. The court observed that the agency removed the child from the mother's care after learning that the mother was living with the child's maternal grandfather in violation of a court order, which the court had issued at an earlier stage of the proceedings. The child's grandfather reportedly sexually abused the mother, which led the trial court to issue a no-contact order between the child and the grandfather. The court noted that the evidence showed that the mother continued to live with either the child's grandfather, despite the no-contact order, or her paramour/friend who previously had sexually abused R.S. The court concluded that the evidence established that the mother had not secured a safe and stable living environment in which her daughter will not be at

risk for sexual abuse. The court thus agreed with the trial court's conclusion that the mother

failed to substantially remedy the conditions that led to the child's removal.

{¶68}  In *In re A.R.*, 6th Dist. Lucas No. L-13-1230, 2014-Ohio-1143, one of the

mother's three children reported that her father had sexually abused her. The mother did not

believe the child's allegation. The agency enacted a safety plan that prohibited the father from

having any contact with the children. The mother nevertheless continued to allow contact

between the father and the children. The trial court eventually granted the agency permanent

custody of the three children. In doing so, the court found that the children cannot be placed with

either parent within a reasonable time or should not be placed with either parent.

{¶69}  On appeal, the mother asserted that clear and convincing evidence did not support

the trial court's finding that the children cannot be placed with her within a reasonable time or

should not be placed with her. The mother first contended that the evidence did not support the

trial court's determination that she failed continuously and repeatedly to remedy the conditions

that caused the children's removal. The appellate court rejected the mother's argument. The

court began by noting that the mother's argument rested upon her "flawed assertion" that the

agency removed the children due to the sexual abuse allegations. *Id.* at ¶ 28. The court explained

that although sexual abuse "precipitated [the agency] referral," it was not the actual cause for

their removal. *Id.* Instead, the agency removed the children due to the mother's "disbelief that

'her boyfriend/the father of her children is the type of person who would' sexually abuse [the

child], and [the mother]'s lack of insight as to how she continued to put her children at risk for

abuse by allowing them to have contact with [him]." *Id.* The appellate court pointed out that the

"trial court specifically held that [the mother] failed to remedy the conditions causing the

removal 'by her ongoing contact with [the father], her failure to effectively and adequately

address the significant and extensive issues of * * * [the child's] sexual abuse in spite of intensive and ongoing efforts of the therapists, and [the] mother failed to adequately prepare a plan for the children about what they should and would do if [the father] further exposes himself to the family.'" *Id.* at ¶ 29.

{¶70} The court concluded that the evidence supported the trial court's findings. The court observed that the caseworker testified that the mother had not made sufficient progress with respect to the case plan because the mother was not "ready or willing to hear the details of [her daughter]'s abuse." *Id.* at ¶ 31. Additionally, the parenting education caseworker testified that although the mother completed a twelve-week parenting course—in addition to an extended course—the mother still lacked the ability to protect her children. The mother's social worker testified that although the mother initially refused to believe the sexual abuse allegations, by the time of the permanent custody hearing, the mother "had accepted that some sexual abuse had occurred." *Id.* at ¶ 33. The court thus determined that the trial court's R.C. 2151.414(E)(1) finding was not against the manifest weight of the evidence.

{¶71} The appellate court next considered the mother's argument that the evidence failed to support the trial court's finding under R.C. 2151.414(E)(4)—that the mother lacked a commitment to her children. The court disagreed that the evidence failed to support the trial court's finding. The court noted that the trial court determined that the mother "demonstrated a lack of commitment to the children by failing to report [the abuse] to the police when family members expressed concerns to her" and by elevating her relationship with the father over the children's safety. *Id.* at ¶ 37. The appellate court concluded that even though the evidence clearly showed that the mother "loves her children," "regularly visited them," and "was committed to physically providing for them," the evidence further showed that the mother "failed to

demonstrate a commitment to the safety and welfare of her children," which "was necessary to demonstrate [the mother]'s willingness to provide an adequate permanent home." *Id.* at ¶ 38.

{¶72} Next, the court considered the mother's argument that the evidence failed to support the court's R.C. 2151.414(E)(14) finding. The court pointed out that the trial court determined that the mother demonstrated an unwillingness to prevent the children from suffering physical, emotional, or sexual abuse based upon the mother's failure to cease contact with the father and her refusal "to process the full extent and serious nature of the sexual trauma [the child] suffered by [the father]." *Id.* at ¶ 40. The appellate court determined that the trial court's findings were not against the manifest weight of the evidence. The court noted that the caseworker testified that the mother "was not ready to hear the details of the abuse and unable to meet the emotional needs of her daughter." *Id.* at ¶ 41. Another caseworker testified that the mother, despite repeated requests, "was unable to verbalize a plan to keep her children safe from sexual abuse." *Id.* at ¶ 43. Additionally, the child's counselor indicated that the child suffers from "trust issues [that] were rooted in the trauma [she] experienced because the adults in her life did not believe that sexual abuse had occurred." *Id.* at ¶ 42. The child's counselor also expressed concern regarding the mother's "ability to provide an environment with 'very clear boundaries' and her ability to provide a nurturing and caring environment." *Id.* The court determined that this collection of facts supported the trial court's R.C. 2151.414(E)(14) finding.

{¶73} In *In re D.H.*, 2nd Dist. Montgomery No. 25159, 2012-Ohio-4619, the court concluded that the trial court's decision that the children could not be placed with their mother within a reasonable time was not against the manifest weight of the evidence. In that case, the mother's paramour raped two of her children, yet the mother did not believe the allegations. At the permanent custody hearing, a psychologist testified that the agency requested her to evaluate

whether the mother would be able to protect her children from potential abuse in the future. The psychologist explained that the mother's "history indicated that when she was in a relationship, she was more focused on the relationship than the children." *Id.* at ¶ 11. The psychologist additionally stated that the mother "indicated that she was not sure if she believed" the sexual abuse allegations and "thought perhaps her aunt was responsible for the allegations, in an effort to prevent her from regaining custody of the children." *Id.* The psychologist related that due to the mother's disbelief, "she's less likely to follow through with what the children need to be able to deal with that in any effective and healthy way," and "less likely to provide the adequate support that they need * * * in healing from that." *Id.* The psychologist also stated that not recognizing the potential threat to her children may lead the mother to "place them in harm's way again." *Id.*

{¶74} The mother's counselor testified that the mother expressed confusion regarding the sexual abuse allegations and believed the children may have been coerced; the mother thus did not "know what to believe." *Id.* at ¶ 15. The counselor stated that the mother eventually "gained insight and realized that she knew her kids and believed in them." *Id.*

{¶75} At the permanent custody hearing, the mother testified that she initially could not believe the man she had been romantically involved with sexually abused her children, but she now believes the abuse occurred. The mother claimed that she would be able to protect the children from any future abuse.

{¶76} The appellate court concluded that the evidence supported a finding under R.C. 2151.414(E)(4). The court observed that for over one year, the mother denied that her paramour had raped her two children. The court believed that the mother prioritized her romantic

relationship over her maternal relationship, and thus, that her conduct illustrated an unwillingness to provide her children with an adequate permanent home.

{¶77} In *In re Misty B.*, 6th Dist. Lucas No. L-94-213, 1995 WL 490965 (Aug. 18, 1995), the agency sought permanent custody of a child after the mother repeatedly expressed doubt that her husband—the child's stepfather—had sexually abused her daughter. The agency asserted that the mother's continued doubt established her unwillingness to take appropriate steps to protect the child. At the permanent custody hearing, the mother's social worker testified that the mother "made little, if any, progress * * * principally because she doubted that [the child] had been molested and consistently denied that [the stepfather] could have molested the child." *Id.* at *2. The social worker additionally indicated that the mother "seemed to be most concerned with clearing the names of herself and her husband." *Id.* The social worker explained that the mother "neither expressed concern about the possibility that [the child] had been traumatized by the abuse nor asked what she could do to help her daughter." *Id.* Another witness stated that the mother attended a twenty-week support program for parents of sexually abused children and never acknowledged that her daughter suffered sexual abuse. The mother's caseworker likewise stated that the mother refused to acknowledge the sexual abuse and indicated that her failure demonstrated that she is unwilling to protect her daughter from future harm.

{¶78} A psychologist who evaluated the mother stated that she "repeatedly indicated that she was not certain [the child] had been abused at all" and "refused to believe that her husband could have been the perpetrator." *Id.* at *3. The mother additionally stated that she would not leave her husband in order to regain custody of her daughter. The psychologist concluded that "because [the mother] would not consider any of the above possibilities, despite corroborating evidence, it was his opinion that she would not be able to protect [the child] from

future abuse." *Id.* The trial court concluded that the mother failed continuously and repeatedly to remedy the conditions that caused the child's removal and granted the agency permanent custody of the child.

{¶79} On appeal, the appellate court found that the trial court did not base its decision upon the mother's failure to acknowledge her husband as the perpetrator, but rather, upon her "lack of adequate progress" with respect to the case plan. *Id.* at *4. The court stated that the record indicated that the mother's lack of progress resulted from her failure to acknowledge that her daughter was sexually abused at all, and not from her failure to name her husband as the perpetrator. *Id.* The court found no evidence that the case plan required the mother to recognize her husband as the perpetrator. *Id.* The court additionally observed that the goal of the mother's case plan was "therapeutic improvement" and to "equip[ her] with the knowledge to protect [the child] from further abuse, regardless of the identity of the perpetrator." *Id.* The court pointed out that two witnesses "testified that because [the mother] was unwilling to admit that [the child] had been sexually abused, she could not progress in her therapy." *Id.* The court thus concluded that the mother "did not lose permanent custody * * * because she refused to admit that her husband * * * sexually abused [the child]. Rather, [the mother] lost her custodial rights because she failed to admit that, despite medical evidence and [the child]'s own claim, her child had been abused and, therefore, she would not be able to protect her daughter in the future." *Id.* at *5.

{¶80} In the case sub judice, the mother did not completely distance herself from the perpetrator. Instead, for a period of five to six months after the children's removal, the mother continued living with the alleged perpetrator. The trial court apparently found that the mother's decision to continue living with the person whom her daughter identified as the perpetrator of sexual abuse spoke volumes about her commitment to her children and her willingness to protect

her children. The court noted that during the time the mother remained living with G.D., she sat

through the adjudicatory hearing and listened to the recording of her daughter's graphic

descriptions of G.D.'s sexual abuse.[4] The trial court described the testimony as "compelling."

Yet even after the mother heard this testimony, she continued living with G.D. for another three

or four months. Even then, the agency's caseworkers stated that the mother and G.D. indicated

that they were separating only to regain custody of the children. Thus, for a period of at least five

to six months, the mother completely and utterly failed to take any steps whatsoever to ensure

that her children could return home to an environment free of sexual abuse. Instead, she did not

believe A.M's allegations at all and continued to live with A.M.'s abuser. The mother's five- to

six-month period of vacillating between her children and her live-in boyfriend does not create

confidence that the mother will prioritize her children's safety and place their best interest over

her own.

{¶81}   When the mother finally did separate from G.D., her expressed intention was to

do so only to regain custody of the children. She did not, therefore, give the court much reason to

believe that she intended to sever all contact with G.D. (except as might be necessary to address

the care and custody of their biological child, E.D.). Additionally, several months after G.D. and

the mother purportedly separated, the foster father spotted them together and a grocery store and

saw them leave in the same vehicle. While the mother offered an innocent explanation for their

contact, the trial court was entitled to discredit it, given the mother's prior refusal to separate

from G.D. for nearly six months, her unwillingness to recognize him as the perpetrator, and her

indications that she and G.D. intended to separate only to regain custody of the children. Because

this is a credibility matter, we will not second-guess the trial court's finding. *See State v.*

---

[4] We observe that the transcript of the adjudicatory hearing was not presented with this appeal. We obtained information regarding the adjudicatory hearing from the trial court's decision granting the agency permanent custody of the children.

*Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 59, quoting *State v. Cowans*, 87 Ohio St.3d 68, 84, 717 N.E.2d 298 (1999) (explaining that reviewing courts must defer credibility matters "to those 'who see and hear what goes on in the courtroom' ").[5]

{¶82}   Furthermore, after G.D. vacated the mother's home, the mother continuously and repeatedly denied that G.D. was the perpetrator and even questioned the truthfulness of her daughter's allegations. As other many other courts have recognized, a parent's doubts regarding a child's abuse allegations raise serious questions about that parent's protective capacities, commitment to providing for the child's emotional needs, and may support findings under R.C. 2151.414(E)(1), (4), and (14). *Z.P.*; *D.F.*; *R.S.*; *A.R.*; *D.H.*; *Misty B. See also In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 47 (concluding that mother's decision to remain living with pedophile-husband supported finding under R.C. 2151.414(E)(14) that she is unwilling to prevent children from suffering physical, emotional, or sexual abuse); *In re A.J.*, 6th Dist. Lucas No. L-13-1118, 2014-Ohio-421, ¶ 55 (stating that mother's "continued skepticism about what occurred under her own roof displays a conscious disregard to protect her children and for their well-being"); *In re J.H.*, 12th Dist. Preble No. CA2007-07-016, 2007-Ohio-7079, ¶¶

---

[5] As Justice Resnick wrote in *Arrington v. DaimlerChrysler Corp.*, 109 Ohio St.3d 539, 2006-Ohio-3257, 849 N.E.2d 1004, ¶¶ 76-77 (dissenting):

> "Demeanor is of the utmost importance in the determination of the credibility of a witness. The innumerable telltale indications which fall from a witness during the course of his examination are often much more of an indication to judge or jury of his credibility and the reliability of his evidence than is the literal meaning of his words." *Govt. of Virgin Islands v. Aquino* (C.A.3, 1967), 378 F.2d 540, 548.
>
> As explained by Judge Learned Hand, "the carriage, behavior, bearing, manner and appearance of a witness—in short, his 'demeanor'—is a part of the evidence. The words used are by no means all that we rely on in making up our minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that a jury is as little confined to them as we are. They may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness. This we have again and again declared, and have rested our affirmance of findings of fact of a judge, or of a jury, on the hypothesis that this part of the evidence may have turned the scale." *Dyer v. MacDougall* (C.A.2, 1952), 201 F.2d 265, 268–269. *See, also, Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273 ("The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony").

30-31 (determining that evidence did not show that father prioritized his children's safety and thus would be unwilling to protect children from future abuse when he intended to stay married to his wife, the abuser, and when he failed to acknowledge that his wife abused the children); *In re Moore*, 7th Dist. Belmont No. 04-BE-9, 2005-Ohio-136, ¶ 40 (upholding trial court's permanent custody decision based, in part, upon testimony from sexual abuse investigator that "if a parent does not believe abuse allegation by a child, they would not be capable of protecting that child from future abuse"); *Matter of Ranker*, 11th Dist. Portage Nos. 95-P-0093-0096, 1996 WL 761159, *10 (Dec. 6, 1996) (noting that court may grant permanent custody when mother is unable to protect her children from a foreseeable abusive situation).

{¶83}  Therefore, we believe that the mother's failure to admit G.D.'s sexual abuse of her daughter supports a finding that the mother failed continuously and repeatedly to substantially remedy the conditions that led to the children's removal, that the mother demonstrated a lack of commitment toward her children by displaying an unwillingness to provide an adequate permanent home for her children, and that the mother is unwilling to prevent her children from suffering physical, emotional, or sexual abuse. The mother may have removed the physical threat G.D. posed, but the mother's failure to believe that G.D. sexually abused her daughter shows that the mother is unwilling to place her children's best interests and safety first. Instead, it shows that she doubts her daughter, has not adequately resolved the issues surrounding her daughter's sexual abuse, and lacks a parent's primal protective instincts.

{¶84}  Furthermore, if the mother does not believe A.M., then she cannot possibly begin to address A.M.'s mental needs as it relates to her sexual abuse and to provide appropriate emotional support. The mother's denials of sexual abuse show that the mother "could not genuinely support or participate in [her daughter's] trauma therapy" and is unprepared to meet

the child's emotional and mental health needs. *Z.P.* at ¶ 12. *See* R.C. 2151.011(B)(1) (defining

"[a]dequate parental care" to mean, in part, "the provision by a child's parent or parents of

specialized services warranted by the child's physical or mental needs"). Her disbelief makes it

less likely that she will follow through with A.M.'s recommended treatment and less likely that

she will provide adequate support. *D.H.* Additionally, by placing her romantic relationship over

her children, the mother demonstrated a lack of commitment to them. *See A.R.*; *D.H.*

{¶85} While we do not discount the mother's efforts to comply with the case plan

activities, the mother unfortunately remained unwilling to believe A.M.'s sexual abuse

allegations. Without a firm belief in A.M.'s allegations, the mother could not begin to

appropriately learn how to care for A.M. and her emotional health—both now and in the future.

{¶86} Consequently, we do not believe that the trial court's finding that the children

cannot be placed with their mother within a reasonable time or should not be placed with them is

against the manifest weight of the evidence.

### b. R.C. 2151.414(E)(16)

{¶87} The trial court appears to have determined that A.M. cannot be placed with J.C.

based upon R.C. 2151.414(E)(16), which allows a court to find that a child cannot be placed with

a parent within a reasonable time or should not be placed with the parent based upon any other

relevant factor. J.C. asserts that the trial court did not provide him a sufficient opportunity to

establish that he can provide A.M. with an adequate permanent home.[6]

{¶88} We believe that the record contains clear and convincing evidence of other

relevant factors to support the trial court's finding that A.M. cannot be placed with J.C. within a

reasonable time or should not be placed with him. J.C. does not have independent housing, even

---

[6] We note that J.C. refers to R.C. 2151.414(E)(1) in his appellate brief. However, the trial court did not appear to find this factor applicable to J.C.

though the case plan specifically indicated that he would need to find safe and stable independent housing. Instead, J.C. lives with his mother, stepfather, and two adolescent relatives. The agency did not deem this home an appropriate placement for A.M. due to J.C.'s mother's past children-services involvement; and J.C. did not suggest that he had any other alternative living arrangements in place. Although J.C. testified that he has applied for HUD housing and eventually plans to move to independent housing, he did not indicate that he would have independent housing within a reasonable period of time. While we commend J.C.'s efforts to address his mental health and his devotion to visiting A.M., unfortunately, he did not obtain appropriate housing and did not state that he would have independent housing within a reasonable period of time. Thus, without independent housing, A.M. cannot be placed with J.C.

{¶89} Furthermore, even if J.C. had independent housing, his mental health issues raise concerns regarding his ability to provide A.M. with the emotional support she needs in order to address G.D.'s sexual abuse. The guardian ad litem testified that J.C.'s mental health issues prevent him from providing A.M. with the emotional support she needs in order to adequately cope with G.D.'s sexual abuse. Moreover, the agency presented testimony that A.M. displays more of a care-giver role with J.C. Given A.M.'s young age and sexual abuse suffered at the hands of her mother's live-in boyfriend, we do not believe that placing her in an environment in which she will feel like the care-giver would be in her best interest.

{¶90} Consequently, we do not believe that the trial court's finding that A.M. cannot be placed with J.C. within a reasonable time or should not be placed with him is against the manifest weight of the evidence.

### 2.  Best Interest

{¶91} K.M. and J.C. additionally challenge the trial court's best interest determination. The mother claims that the record does not contain clear and convincing evidence to support the trial court's finding that placing the children in the agency's permanent custody is in their best interests. J.C. asserts that the record does not contain clear and convincing evidence to support the trial court's finding that placing A.M. in the agency's permanent custody is in her best interest.

{¶92} R.C. 2151.414(D)(1) requires a trial court to consider all relevant, as well as specific factors to determine whether a child's best interest will be served by granting a children services agency permanent custody. The specific factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶93} Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors." *In re C.F.,* 113 Ohio St.3d 73, 2007–Ohio–1104, 862 N.E.2d 816, ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56; *accord In re C.G.,* 9th Dist. Summit Nos. 24097 and 24099, 2008–Ohio–3773, ¶ 28; *In re N.W.*, 10th Dist. Franklin Nos. 07AP-590 and 07AP-591, 2008-Ohio-297, ¶ 19. However, none of the best interest factors requires a court to give it "greater weight or

heightened significance." *C.F.* at ¶ 57. Instead, the trial court considers the totality of the

circumstances when making its best interest determination. *In re K.M.S.*, 3d Dist. Marion Nos.

9-15-37, 9-15-38, and 9-15-39, 2017-Ohio-142, ¶ 24; *In re A.C.,* 9th Dist. Summit No. 27328,

2014–Ohio–4918, ¶ 46. In general, "[a] child's best interest is served by placing the child in a

permanent situation that fosters growth, stability, and security." *In re C.B.C.*, 4th Dist. Lawrence

Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 66, citing *In re Adoption of Ridenour,* 61 Ohio

St.3d 319, 324, 574 N.E.2d 1055 (1991).

### a. Children's Interactions and Interrelationships

{¶94} The children share a bond with their mother and with each other. The agency did

not raise any concerns regarding the mother's interaction with the children during visitations.

However, the agency expressed deep concern regarding the mother's protective capacities due to

her lack of faith in her daughter's sexual abuse allegations. Therefore, while the mother and her

children may share a strong bond and interact well with each other, the mother displayed an

unwillingness to believe her daughter over her paramour, which thus supports a finding that the

mother's relationship with her children is not her first priority. *See In re L.D.*, 2017-Ohio-1037,

86 N.E.3d 1012, ¶ 38 (8th Dist.) (noting that while a loving relationship is beneficial and

important for child's overall development, "mere existence of a good relationship is

insufficient" and that "mother's bond with her children is not weighed more heavily than the

other statutory best interest factors") (citations and internal quotations omitted).

{¶95} G.D. sexually abused A.M. Thus, she does not share a positive relationship with

him. The agency presented little evidence regarding E.D.'s relationship with G.D.

{¶96} Before the agency removed the children from the mother's home, J.C. did not

frequently see A.M. Following her removal, J.C. consistently visited A.M. and appeared to act

appropriately with her, for the most part. The agency did express concern, however, that A.M. exhibited more of a care-taking role with her father.

{¶97} The children are bonded to one another and share a typical sibling relationship. They have lived with the same foster family since their removal, and their foster parents describe the children as pleasant. The foster parents do not intend to adopt the children.

### b. Children's Wishes

{¶98} A.M. consistently indicated that she would like to return to her mother's custody. E.D. is too young to meaningfully express his wishes. The guardian ad litem recommended that the trial court award the agency permanent custody of the children. *In re S.M.*, 4th Dist. Highland No. 14CA4, 2014-Ohio-2961, ¶ 32, citing *C.F.* at ¶ 55 (noting that R.C. 2151.414 permits court to consider child's wishes as child directly expresses or through the guardian ad litem).

### c. Custodial History

{¶99} Until their removal, the children lived with their mother. A.M. lived with both her mother and J.C. for the first few years of her life, and then with her mother and G.D. E.D. lived with his mother and G.D. from birth until his removal.

{¶100} In May 2016, the agency removed the children from their home, and they have been in the agency's temporary custody since that time. When the agency filed its April 2017 permanent custody motion, the children had not been in its temporary custody for more than twelve months. At the time of the permanent custody hearing, the children had been in the agency's custody for approximately fourteen months.

### d. Legally Secure Permanent Placement

{¶101} "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56, citing *In re Dyal,* 4th Dist. Hocking No. 01CA12, 2001 WL 925423, *9 (Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.,* 10th Dist. Franklin Nos. 15AP–64 and 15AP–66, 2015–Ohio–4682, ¶ 28 (observing that legally secure permanent placement requires more than stable home and income but also requires environment that will provide for child's needs); *In re J.H.,* 11th Dist. Lake No. 2012–L–126, 2013–Ohio–1293, ¶ 95 (stating that mother unable to provide legally secure permanent placement when she lacked physical and emotional stability and that father unable to do so when he lacked grasp of parenting concepts); *In re J.W.,* 171 Ohio App.3d 248, 2007–Ohio–2007, 870 N.E.2d 245, ¶ 34 (10th Dist.) (Sadler, J., dissenting) (stating that a legally secure permanent placement means "a placement that is stable and consistent"); Black's Law Dictionary 1354 (6th Ed. 1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure safety"); *id.* at 1139 (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient"). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *M.B.* at ¶ 56. Furthermore, a trial court that is evaluating a child's need for a legally secure permanent placement and whether the child can achieve that type of placement need not determine that terminating parental rights is "not only a

necessary option, but also the only option." *Schaefer* at ¶ 64. Rather, once the court finds the existence of any one of the R.C. 2151.414(B)(1)(a)-(e) factors, R.C. 2151.414(D)(1) requires the court to weigh "all the relevant factors * * * to find the best option for the child." *Id.*

{¶102} Here, the evidence supports a finding that the children need a legally secure permanent placement and that they cannot achieve this type of placement without granting the agency permanent custody. The mother's unwillingness to recognize G.D. as the perpetrator of A.M.'s sexual abuse and hesitancy to even believe that A.M. was sexually assaulted shows that she cannot provide the children with a legally secure permanent placement. The children would not be safe and secure with a mother who fails to believe her children's abuse allegations. G.D.'s sexual abuse of A.M. demonstrates that he is not a safe and secure placement for either child. Although J.C. would like to be able to provide A.M. with a legally secure permanent placement, he did not demonstrate that he will be able to do so in a reasonable period of time. Furthermore, his mental health issues raise concerns whether he would be able to provide a proper environment for A.M.

### e. R.C. 2151.414(E)(7)-(11) [7]

---

[7] R.C. 2151.414(E)(7)-(11) state:

> (7) The parent has been convicted of or pleaded guilty to one of the following:
> (a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
> (b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
> (c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
> (d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially

{¶103} The trial court found that R.C. 2151.414(E)(11) applied to G.D.

### f. Balancing

{¶104} In light of the foregoing, we do not believe that the trial court's best interest determination is against the manifest weight of the evidence. Although the evidence shows that the children share a bond with their mother, the mother's consistent failure to believe A.M.'s allegations and decision to continue to reside with A.M.'s abuser for more than five months does not show that she will prioritize their safety over her desires. Furthermore, her unwillingness to believe A.M. illustrates that she cannot provide her children with a home where they will feel safe and where all of their emotional needs will be met. The mother's conduct displayed that she lacks one of a parent's primal instincts—to protect her children. Even though the mother claims that she finally believes A.M.'s allegations and that G.D. was the perpetrator, the trial court found her claims dubious. We will not second-guess its determination.

---

equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

(e) An offense under section 2905.32, 2907.21, or 2907.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

(f) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a), (d), or (e) of this section.

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶105} The totality of the evidence additionally shows that placing A.M. with J.C. is not in her best interest. J.C. does not have appropriate housing for A.M. and did not set forth a timeframe for when he might be able to obtain appropriate housing. Moreover, even if J.C. obtained appropriate housing, the evidence does not show that J.C. would be able to provide for all of A.M.'s emotional needs. J.C.'s own mental health issues, although treated with medication, call into question his ability to adequately address A.M.'s emotional health as it relates to her sexual victimization.

{¶106} Accordingly, based upon the foregoing reasons, we overrule the mother's first, and J.C.'s sole, assignment of error.

## D. REASONABLE EFFORTS

{¶107} In her second assignment of error, the mother asserts that the trial court erred by granting permanent custody of the children to the agency when the agency failed to use reasonable efforts to reunify her with the children. She charges that the agency prematurely decided to seek permanent custody, rather than affording her a reasonable amount of time to show that the children could be reunified with her. The mother additionally asserts that the agency's efforts were not reasonable. She argues that the reunification efforts should have intensified after G.D. moved out of the home, that the agency should have coordinated counseling between the mother and A.M., and that the agency should have offered the mother specific training to learn how to recognize abuse. The mother essentially asserts that the trial court's reasonable-efforts finding is against the manifest weight of the evidence.

{¶108} R.C. 2151.419(A)(1) requires a trial court to determine whether a children services agency "made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it

possible for the child to return safely home." However, this statute applies only at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children * * *." *C.F., supra*, at ¶ 41; *accord* In re C.B.C., 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016–Ohio–916, ¶ 72. Thus, " '[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.'" *C.F.* at ¶ 41, quoting *In re A.C.*, 12th Dist. Clermont No. CA2004–05–041, 2004–Ohio–5531, ¶ 30. Nonetheless, "[t]his does not mean that the agency is relieved of the duty to make reasonable efforts" before seeking permanent custody. *Id.* at ¶ 42. Instead, at prior "stages of the child-custody proceeding, the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification." *Id.* Additionally, "[if] the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.

{¶109} In the case at bar, the mother's appeal does not originate from one of the types of hearings specifically listed in R.C. 2151.419(A): "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children." The agency, therefore, was not required to prove at the permanent custody hearing that it used reasonable efforts to reunify the family, unless it had not previously done so.

{¶110} Here, the record reflects that the trial court made reasonable efforts findings before the agency filed its permanent custody motion. Thus, the court did not need to again find that the agency used reasonable efforts before it could grant the agency permanent custody of the children. *E.g., In re M.H.-L.T.*, 4th Dist. Washington No. 17CA12, 2017-Ohio-7825, ¶ 64; *In re S.S.*, 4th Dist. Jackson Nos. 16CA7 and 16CA8, 2017–Ohio–2938, ¶ 168. We note, however, that

the court did enter a reasonable efforts finding in its permanent custody decision. The mother essentially asserts that this finding is against the manifest weight of the evidence.

{¶111} We discussed the meaning of "reasonable efforts" in *C.B.C.*, *supra*, at ¶ 76, as follows:

> In general, "reasonable efforts" mean " '[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed.' " *C.F.* at ¶28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation,* 12 B.U.Pub.Int.L.J. 259, 260 (2003). " 'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.' " *In re H.M.K.,* 3d Dist. Wyandot Nos. 16–12–15 and 16–12–16, 2013–Ohio-4317, ¶95, quoting *In re D.A.,* 6th Dist. Lucas No. L–11–1197, 2012–Ohio–1104, ¶30. In other words, the agency must use reasonable efforts to help remove the obstacles preventing family reunification. Bean, *Reasonable Efforts: What State Courts Think,* 36 U. Tol. L.Rev. 321, 366 (2005), quoting *In re Child of E.V.,* 634 N.W.2d 443, 447 (Minn.Ct.App.2001), and *In re .L.P.,* No. C1–99–1235, 2000 WL 343203, at *5 (Minn.Ct.App. Apr. 4, 2000) (explaining that he agency must address what is "necessary to correct the conditions that led to the out-of-home placement" and must "provide those services that would assist in alleviating the conditions leading to the determination of dependency"). However, " '[r]easonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how

remote, may have made reunification possible." *In re Lewis,* 4th Dist. Athens No. 03CA12, 2003–Ohio–5262, ¶16. Furthermore, the meaning of "reasonable efforts" "will obviously vary with the circumstances of each individual case." *Suter v. Artist M.,* 503 U.S. 347, 360, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). Additionally, "[i]n determining whether reasonable efforts were made, the child's health and safety shall be paramount." R.C. 2151.419(A)(1).

{¶112} We initially reject the mother's argument that the agency prematurely sought permanent custody. The mother does not cite any directly applicable authority that states a children services agency must allow parents a certain amount of time to work on a case plan before the agency can file a permanent custody motion. Instead, she cites one of our prior cases involving an agency's decision to seek permanent custody as the initial disposition. *In re Allbery*, 4th Dist. Hocking No. 05CA12, 2005-Ohio-6529. Moreover, in that case, we did not state that the timing of an agency's permanent custody motion must be reasonable. Rather, we noted that if an agency seeks permanent custody as the initial disposition on the basis of R.C. 2151.414(E)(1), the agency must establish that it provided the parent with " 'a case plan and an opportunity to correct the situation that caused the removal.' " *Id.* at ¶ 24, quoting *In re Ward*, 4th Dist. Scioto No. 99CA2677, 2000 WL 1074070, *5 (Aug. 2, 2000).

{¶113} Moreover, although former R.C. 2151.413(A) required a children services agency to have temporary custody of a child for at least six months immediately before filing a permanent custody motion, the current version of the statute does not contain a time limitation. *In re G.B.,* 9th Dist. Summit No. 22628, 2005-Ohio-4540, ¶¶ 20-21, citing *In re Hayes*, 79 Ohio St.3d 46, 679 N.E.2d 680 (1997), syllabus; *In re Brenna E.*, 124 Ohio App.3d 143, 705 N.E.2d

728 (6th Dist.1997); *accord In re E.W.*, 4th Dist. Athens No. 17CA10, 2017-Ohio-7258, ¶ 26

(stating that statutes governing permanent custody motions do not contain time limitation before

an agency may file a motion to modify a disposition to permanent custody).

{¶114} Next, we disagree with the mother that the trial court's reasonable-efforts finding

is against the manifest weight of the evidence.[8] Simply because the agency did not ultimately

determine to place the children in the home on a trial basis or to allow unsupervised visitation

does not mean that the agency failed to use reasonable efforts. Instead, the agency cited rational

reasons for choosing not to permit overnight or unsupervised visits. Of note, for more than five

months, the mother continued to live with G.D. Obviously, the agency would not risk placing the

children in the home or allowing unsupervised visits in the home while G.D., the perpetrator of

A.M.'s sexual abuse, still lived there. Once G.D. moved out of the home, the agency indicated

that it did not allow overnight or unsupervised visits in the home due to the mother's consistent

refusal to believe A.M.'s allegations. The agency expressed concern that if the mother did not

believe A.M., then she might try to discuss the allegations with A.M. and attempt to persuade

A.M. that her allegations were wrong. The agency additionally did not want the mother

discussing the allegations with A.M. at all. Thus, it was not the agency's lack of reasonable

efforts, but the mother's failure to completely accept A.M.'s allegations that resulted in the

agency's decision not to intensify reunification efforts after G.D. vacated the home.

{¶115} Additionally, the agency did not coordinate counseling between the mother and

A.M. upon the advice of A.M.'s counselor. Caseworker Carsey explained that she initially

---

[8] As we did in *C.B.C.*, we assume, without deciding, that the manifest-weight-of-the evidence standard applies to a reasonable-efforts determination. *See id.* at ¶ 75. However, we recognize that other courts have applied an abuse-of-discretion standard. *E.g., In re C.C.* at ¶ 14.

thought the mother and A.M. could sit down together and discuss the matter, but Carsey later

discussed it with A.M.'s counselor and the counselor advised against it.

{¶116} The evidence thus demonstrates that it was not the agency's lack of reasonable

efforts that led to their continued removal, but the mother's "baffling" failure to believe A.M.'s

allegations that resulted in their continued removal.

{¶117} Consequently, we disagree with the mother that the agency failed to use

reasonable efforts.  Accordingly, based upon the foregoing reasons, we overrule the mother's

second assignment of error.

## IV.  CONCLUSION

{¶118} Having overruled all of the parents' assignments of error, we affirm the trial

court's judgments.

JUDGMENTS AFFIRMED.

**JUDGMENT ENTRY**

It is ordered that the JUDGMENTS ARE AFFIRMED. Appellants shall pay the costs herein taxed, jointly and severally.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and McFarland, J.: Concur in Judgment and Opinion.

For the Court

By:_____
          Marie Hoover, Presiding Judge

**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.